This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-35939**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**SADE SERRANO,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Christina P. Argyres, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Meryl E. Francolini, Assistant Attorney General
Albuquerque, NM

for Appellee

McCleary & Richter-Freund
Mary McCleary
Albuquerque, NM

for Appellant

## MEMORANDUM OPINION

**ATTREP, Judge.**

**{1}** Defendant Sade Serrano appeals his convictions for two counts of criminal sexual penetration of a minor (CSPM), contrary to NMSA 1978, Section 30-9-11(G)(1) (2009) (child between the ages of thirteen and sixteen when the perpetrator is at least eighteen years of age and is at least four years older than the child). Defendant makes numerous arguments on appeal: (1) his right to speedy trial was violated, (2) his right to confrontation was violated by the admission of testimony about his birthdate, (3) the

district court abused its discretion in admitting a Facebook message, (4) prosecutorial misconduct during closing arguments amounted to fundamental error, and (5) cumulative error. Finding no error, we affirm.[1]

## BACKGROUND

**{2}**     Defendant met V.P. at church in Albuquerque in February 2010. At the time, V.P. was almost fifteen years old. Defendant represented to V.P. that he was a seventeen or eighteen-year-old biological male, who went by the name Jacob Serrano. In reality, Defendant was twenty-three or twenty-four years old and biologically female but identified as male. Defendant and V.P. began a romantic relationship in May 2010. In August 2010, a pastor at the church discovered Defendant's true age and biological sex and brought it to the attention of V.P.'s mother. V.P.'s mother then disclosed this information to V.P., who was reluctant to believe her mother because V.P. insisted Defendant had a penis and she and Defendant "did stuff," which V.P.'s mother understood to mean sexual intercourse.

**{3}**     V.P. testified about the first time she had sexual intercourse with Defendant. Defendant did not permit V.P. to touch his genitals. V.P. recalled that Defendant turned around to put a condom on before sex and that she could not see Defendant's penis because it was dark. V.P. then testified Defendant put his penis in her vagina, and it felt "[l]ike something was inside [her]." V.P. also testified that they had sexual intercourse a second time about a week later. Defendant denied having sexual intercourse with V.P. Defendant also testified that he had not undergone sexual reassignment surgery and that statements to the contrary he made in a diary were false. Defendant was convicted and now appeals. We reserve further discussion of the facts for our analysis.

## DISCUSSION

### I.     Speedy Trial

**{4}**     Defendant argues the district court erred in denying his speedy trial motion. After a comprehensive review of the briefs, the record, the relevant case law, and the thorough district court order, we adopt the reasoning of the district court's order dated April 20, 2016, and address Defendant's claims of error only briefly. Further, we do not go through the procedural history underlying Defendant's speedy trial claim as the relevant facts are set forth in the district court's order.

**{5}**     In determining whether a defendant has been deprived of the right to a speedy trial, we analyze the four factors set out by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972): "(1) the length of delay in bringing the case to trial, (2) the reasons for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) the prejudice to the defendant caused by the delay." *State v. Serros*, 2016-NMSC-

---

1Because we find no error, we need not address Defendant's cumulative error argument. *See State v. Aragon*, 1999-NMCA-060, ¶ 19, 127 N.M. 393, 981 P.2d 1211 (concluding there was no cumulative error where there was "no error in the actions and decisions of the trial court").

008, ¶ 5, 366 P.3d 1121. In analyzing the *Barker* factors, "we give deference to the district court's factual findings, but we review the weighing and the balancing of the *Barker* factors de novo." *State v. Spearman*, 2012-NMSC-023, ¶ 19, 283 P.3d 272 (alterations, internal quotation marks, and citation omitted).

## A. Length of Delay

**{6}** As for the length of delay, we agree with the district court and the parties that this was a simple case and that the total delay was approximately twenty-seven months. Because the delay in this case was over twice the twelve-month presumptive period, we also agree with the district court that this factor weighs heavily against the State. *See State v. Moore*, 2016-NMCA-067, ¶ 11, 378 P.3d 552 (holding that "a delay approximately twice as long as the threshold weighs heavily against the [s]tate").

## B. Reasons for Delay

**{7}** As for the reasons for delay, Defendant largely agrees with the district court's analysis, but contends that a six-month period, during which the State did not request a trial date, should have been weighed against the State. Even though there was no trial date set during that period, as noted by the district court, the State made other efforts to move the case to a timely resolution, which included certifying disclosure of information, sending a plea offer, attempting to schedule pretrial interviews, and requesting a scheduling conference. Given this, we agree with the district court's determination that this period should weigh neutrally. *See State v. Maddox*, 2008-NMSC-062, ¶ 27, 145 N.M 242, 195 P.3d 1254 (weighing period neutrally where "the case moved toward trial with customary promptness"), *abrogated on other grounds by State v. Garza*, 2009-NMSC-038, ¶¶ 47-48, 146 N.M. 499, 212 P.3d 387; *see id.* ¶¶ 24-26 (providing that "plea negotiations are themselves not a factor to be held against either party" so long as the state "continue[s] to move the case toward trial"). Defendant did not challenge the district court's additional determinations that another two months weighed neutrally, two months weighed against Defendant, and fourteen months weighed slightly against the State.[2] And we find no error in these determinations.

## C. Assertion of the Right

**{8}** As for the assertion of the right, "we assess the timing of the defendant's assertion and the manner in which the right was asserted." *Garza*, 2009-NMSC-038, ¶ 32. Upon our review of the record, we agree with the district court that Defendant's two

---

[2]Defendant nevertheless argues that "[t]he reasons for the delay should weigh almost as heavily against the State as bad faith[,]" citing the over three-year period between law enforcement's first involvement in the case and Defendant's indictment. This argument is without merit. It is well settled that preaccusation delay does not factor into our speedy trial analysis. *See State v. Urban*, 2004-NMSC-007, ¶ 12, 135 N.M. 279, 87 P.3d 1061 ("In general, the right [to a speedy trial] attaches when the defendant becomes an accused, that is, by a filing of a formal indictment or information or arrest and holding to answer." (internal quotation marks and citation omitted)); *Gonzales v. State*, 1991-NMSC-015, ¶ 3, 111 N.M. 363, 805 P.2d 630 (stating that consideration of preaccusation delay is properly done in a due process analysis and is distinct from the Sixth Amendment speedy trial analysis).

pro forma requests for speedy trial and his motion to dismiss for violation of his right to a speedy trial, filed approximately three months before trial, weigh only slightly in Defendant's favor. *See State v. Ochoa*, 2017-NMSC-031, ¶ 41, 406 P.3d 505 ("Pro forma assertions are sufficient to assert the right, but are given little weight in a defendant's favor."); *State v. Moreno*, 2010-NMCA-044, ¶ 35, 148 N.M. 253, 233 P.3d 782 (concluding that the assertion factor weighs only slightly in favor of the defendant when he asserted his right once pro forma, and in a motion to dismiss two and one-half months prior to trial).

### D.    Prejudice

**{9}**    We next examine whether Defendant was prejudiced as a result of the delay. "The heart of the right to a speedy trial is preventing prejudice to the accused." *Garza*, 2009-NMSC-038, ¶ 12. To determine if Defendant was prejudiced, we consider whether there was (1) oppressive pretrial incarceration, (2) anxiety and concern of the accused, and (3) impairment of Defendant's defense. *See id.* Generally, it is the defendant's burden to "make a particularized showing of prejudice to demonstrate a violation of any of the three interests." *State v. Samora*, 2016-NMSC-031, ¶ 21, 387 P.3d 230.

**{10}**    First, Defendant argues that he suffered oppressive pretrial incarceration. "The oppressive nature of the pretrial incarceration depends on the length of incarceration, whether the defendant obtained release prior to trial, and what prejudicial effects the defendant has shown as a result of the incarceration." *Garza*, 2009-NMSC-038, ¶ 35. Of the total delay in this case, Defendant was incarcerated for approximately thirty days due to his violation of conditions of release. He argues, without citation to authority, that this incarceration was oppressive because he was forced to serve this time in segregation due to his transgender status. While our Supreme Court has acknowledged that a prolonged period in solitary confinement, regardless of whether the defendant was placed there for his own safety, may be sufficient to establish prejudice when a defendant asks to be transferred out of segregation, Defendant has not established that the length of his confinement in segregation was oppressive or that he requested to be transferred. *See Serros*, 2016-NMSC-008, ¶ 91.

**{11}**    Defendant also briefly argues that his incarceration was "undue" because the condition Defendant repeatedly violated, which resulted in his incarceration, eventually was lifted by the district court. In support, Defendant cites *State v. Brown*, 2017-NMCA-046, ¶¶ 38-40, 396 P.3d 171. Defendant's reliance on *Brown* is misplaced. This Court in *Brown* considered the prejudice to the defendant when his entire term of pretrial incarceration was found to be *unlawful* by our Supreme Court. *Id.* ¶ 40. Defendant provides no argument or authority supporting a finding that his conditions of release were unlawful, and, consequently, we cannot say Defendant suffered undue pretrial incarceration when he was remanded for violating a condition that eventually was modified.

**{12}**    Second, Defendant argues that the anxiety and stress he suffered are sufficient to support a finding of particularized prejudice. Defendant, however, makes no effort to

establish any of his anxiety and stress was a result of the delay itself. Because "we are unable to determine from the record before us if the prejudice resulted from the delay in this case[,]" we agree with the district court that Defendant has failed to establish the delay in this case caused undue anxiety and concern. *See Spearman*, 2012-NMSC-023, ¶ 38.

**{13}** Third, with respect to impairment of his defense, Defendant argues a key part of his defense was that V.P.'s allegations were vague and lacking detail from the beginning and that his defense was impaired by V.P.'s lack of memory at trial. In support, Defendant cites to an exchange during V.P.'s cross-examination. When V.P. was asked if she ever provided more detail about the sexual encounters between her and Defendant, she responded, "[w]ell, it was six years ago. I don't know. If you guys had the trial sooner, I would have remembered more." But Defendant fails to acknowledge that V.P. then immediately admitted she had never been able to provide more detail. Thus, notwithstanding V.P.'s statement regarding the passage of time, Defendant's theory of defense was not impaired.

**{14}** Finally, Defendant argues he was prejudiced by the delay in this case because it allowed the State to obtain a diary entry written by Defendant, which was introduced at trial as State's Exhibit 2. Defendant, however, makes no attempt to show how this evidence impaired his defense, merely stating that if Defendant's trial would have been timely, "he would not have had to address Exhibit 2 in his defense." Defendant thus seems to argue not that his defense was impaired but that the State's case was strengthened—a proposition for which he cites no authority. We decline to consider this argument further. *See State v. Casares*, 2014-NMCA-024, ¶ 18, 318 P.3d 200 ("We will not consider an issue if no authority is cited in support of the issue, because absent cited authority to support an argument, we assume no such authority exists."); *see also State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (explaining that appellate courts are under no obligation to review unclear or undeveloped arguments).

**{15}** We agree with the district court that the prejudice factor does not weigh in Defendant's favor.

**E.    Balancing the Factors**

**{16}** Finding none of Defendant's arguments persuasive, and concluding the district court did not err in its speedy trial analysis, we agree with the district court's determination that, upon balancing the *Barker* factors, Defendant's right to a speedy trial was not violated. *See Garza*, 2009-NMSC-038, ¶ 40 (holding that because "[the d]efendant failed to demonstrate particularized prejudice" and "the other factors do not weigh heavily in [the d]efendant's favor[,]" the defendant's right to a speedy trial was not violated); *State v. Hayes*, 2009-NMCA-008, ¶ 16, 145 N.M. 446, 200 P.3d 99 (holding that even though the first three *Barker* factors weigh against the state, "the absence of prejudice to [the d]efendant fulfills the [s]tate's burden to overcome the presumption of prejudice that arises from the delay in this case").

**{17}** We affirm the district court's denial of Defendant's speedy trial motion.

## II.     Admission of Birthdate Testimony

**{18}** At trial, Officer Alma Gonzalez Ramirez testified to Defendant's date of birth from a Motor Vehicle Division (MVD) database after purportedly refreshing her recollection with a police report.[3] Defendant argues that admission of the officer's statement amounted to testimonial hearsay, violating his right to confrontation. *See State v. Cabezuela*, 2011-NMSC-041, ¶ 49, 150 N.M. 654, 265 P.3d 705 ("Under the Confrontation Clause, out-of-court testimonial hearsay is barred unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." (alterations, omission, internal quotation marks, and citation omitted)). Notwithstanding the myriad evidence establishing Defendant's age at trial, Defendant contends Officer Ramirez's statement as to his date of birth was harmful. We disagree. Even if we assume Officer Ramirez's statement was inadmissible testimonial hearsay—violative of Defendant's right to confrontation—"there is no reasonable possibility it affected the verdict." *See State v. Tollardo*, 2012-NMSC-008, ¶ 36, 275 P.3d 110 (emphasis omitted).

**{19}** "Improperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful." *Id.* ¶ 25. "Harmless error review necessarily requires a case-by-case analysis, questioning whether a guilty verdict in a particular case is attributable to a particular error." *State v. Cabezuela*, 2015-NMSC-016, ¶ 30, 350 P.3d 1145 (alteration, internal quotation marks, and citation omitted); *see also Tollardo*, 2012-NMSC-008, ¶ 43 (listing, among other considerations in the harmless error inquiry, "evidence of a defendant's guilt separate from the error," "the importance of the erroneously admitted evidence in the prosecution's case," and "whether the error was cumulative" (alterations, internal quotation marks, and citation omitted)). Our review of the evidence in this case in light of the purported error satisfies us that the error, if any, was harmless.

**{20}** Defendant was charged and convicted of violating Section 30-9-11(G)(1), which, in relevant part to our discussion here, required that Defendant be at least eighteen years old and at least four years older than V.P. at the time of the offense. Although Officer Ramirez's statement was the only one establishing Defendant's exact birthdate, that Defendant met the age requirements in Section 30-9-11(G)(1) was simply undisputed at trial. Of the six witnesses at trial, five, including Officer Ramirez, testified to Defendant's age being over eighteen years and more than four years older than V.P. at the relevant time. In a diary written at the time of his relationship with V.P., Defendant wrote "[w]e are 7 years apart," "I'm going to be 24," and "I'm 7 years older," among other

---

3Defendant disputes whether Officer Ramirez's memory about the birthdate from the MVD database was refreshed with the police report or whether Officer Ramirez simply recited the date of birth from the report. As noted below, we assume for purposes of our analysis, as Defendant contends, that Officer Ramirez's statement about Defendant's date of birth was testimonial hearsay. We thus need not delve into the morass of whether Officer Ramirez testified from her own refreshed memory of the MVD database or impermissibly recited from the report.

entries indicating Defendant's age. What is more, Defendant testified that he was twenty-three when he joined the youth group where he met V.P. And Defendant testified that at the time of trial, which was approximately six years after the offense, he was almost thirty years old. The insignificance of Defendant's birthdate is punctuated by his defense at trial—that he never engaged in sexual intercourse with V.P., not that his age fell within permissible limits. Further, the State placed little emphasis on Defendant's birthdate, instead noting that regardless of the exact birthdate, Defendant clearly met the statutory age requirements.

**{21}** Based on the foregoing, Officer Ramirez's statement about Defendant's birthdate was redundant and unimportant to the State's case. *See State v. Johnson*, 2004-NMSC-029, ¶ 39, 136 N.M. 348, 98 P.3d 998 (concluding that evidence is merely cumulative "where the evidence is so redundant that its corroborative effect is negligible"); *see also State v. Ortega*, 2014-NMSC-017, ¶ 22, 327 P.3d 1076 (stating that the victim's erroneously admitted toxicity levels were unimportant to the state's case when the cause of death was determined to be gunshot wounds).

**{22}** We thus conclude there is no reasonable possibility that the asserted error contributed to the verdict.

### III. Admission of Facebook Message

**{23}** Defendant challenges the admission of a Facebook message, in which Defendant purportedly wrote that he gave V.P. his virginity, among other inculpatory statements. Defendant asserts the State failed to properly authenticate or lay a sufficient foundation to attribute the message to him. We cannot agree. "We review the admission of evidence under an abuse of discretion standard and will not reverse in the absence of a clear abuse." *State v. Candelaria*, 2019-NMCA-032, ¶ 41, 446 P.3d 1205 (internal quotation marks and citation omitted). "There is no abuse of discretion when the evidence is shown by a preponderance of the evidence to be what it purports to be." *State v. Jackson*, 2018-NMCA-066, ¶ 13, 429 P.3d 674 (alteration, internal quotation marks, and citation omitted).

**{24}** Before trial, the district court heard argument regarding the admissibility of the Facebook message. In arguing for the message's admission, the State presented the district court with excerpts from a diary containing letters exchanged between Defendant and V.P. in which Defendant wrote that if he made a social media page, he and V.P. could "talk still and your mom can't do anything because she can't figure it out." The district court reserved ruling for trial.

**{25}** During trial, the State presented additional foundational evidence through V.P.'s mother, who testified as follows.[4]

  Q. Did you ever become aware of a Facebook account?

---

[4] We have omitted bench conferences and objections, none of which were sustained, from the quoted testimony.

A.     Yes.

Q.     That was created by [Defendant]?

A.     Yes.

Q.     And how did you become aware of that information?

A.     [V.P.] gave me the password and the user name.

Q.     And when you received that password and user name, what did you do with that information?

A.     I looked it up.

Q.     And when you opened up that account, were you—what were you able to see?

A.     A message from [Defendant].

       . . . .

Q.     . . . You said that [V.P.] had given you the user name and password. What is your understanding of how [V.P.] obtained the user name? Who provided [V.P.] the user name and password?

A.     A friend.

       . . . .

Q.     And who was the originator of the account?

       . . . .

A.     [Defendant].

       . . . .

Q.     And when you look at that Facebook page, who is the individual — what is the name of the individual who sent the message to that profile?

A.     Jacob Serrano.

Q.     And how do you know that? When you look at that Facebook message, how do you know that it's Jacob?

A.    It says Jacob, but he also told me.

Q.    He also told you as well. Okay.

A.    After he said that I . . . He said I needed to stay out of his business and he was going to talk to her one way or the other.

Q.    . . . He told you that in that conversation when he told you that he was going [to] create this Facebook page?

A.    That's how he was going to keep in contact without me getting in the middle.

The district court admitted State's Exhibit 1, the Facebook message, after this exchange.

**{26}** "To satisfy the requirement of authenticating . . . evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 11-901(A) NMRA; *see also Guest v. Allstate Ins. Co.*, 2009-NMCA-037, ¶ 47, 145 N.M. 797, 205 P.3d 844 ("In determining the necessary foundation for an admission by a party opponent, we are guided by Rule 11-901(A)."), *rev'd in part on other grounds*, 2010-NMSC-047, 149 N.M. 74, 244 P.3d 342. Authentication can be made using either direct or circumstantial evidence, *see State v. Romero*, 2019-NMSC-007, ¶ 41, 435 P.3d 1231, and poses a relatively low threshold, *see* Rule 11-901(A).

**{27}** Defendant argues that the Facebook message was not properly authenticated because V.P.'s mother's testimony was not evidence of who actually wrote the message. V.P.'s mother, however, testified not only to her knowledge about the origin of the Facebook message but also to Defendant's statements pertaining to the message. *See* Rule 11-901(B)(1) (permitting authentication through a witness with knowledge); *see also Guest*, 2009-NMCA-037, ¶ 48 (holding that the plaintiff "established the requisite foundation for admission . . . by a party-opponent . . . [when she] testified that the documents were [the defendant's]").

**{28}** Moreover, any doubts that the State met the foundational requirements are put to rest upon an examination of the totality of the circumstances. *See Romero*, 2019-NMSC-007, ¶¶ 42-43 ("Considering the totality of the circumstances, . . . substantial corroborating evidence indicate[d] that [the d]efendant placed the telephone call."). Specifically, the message mirrors distinctive characteristics manifested in the diary, also admitted into evidence, including frequent use of the term "idk"; repeated references to God; discussion of intense romantic feelings for V.P.; references to the age difference between Defendant and V.P. characterized as wrong; and references to V.P. by both her full name and nickname. *See Jackson*, 2018-NMCA-066, ¶ 13 ("The authentication requirement may be satisfied by evidence of 'appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.' " (quoting Rule 11-901(B)(4))). Moreover, the message, itself, contains

facts peculiarly known to Defendant and statements someone in his position would make. *See Candelaria*, 2019-NMCA-032, ¶ 54 ("A writing can be shown to have come from a specific person by virtue of disclosing knowledge of facts known peculiarly to him." (alteration, internal quotation marks, and citation omitted)). The message included claims such as he "just got home from hanging out with Juan"; [5] "[I] lied to you and you stayed"; "[I] tried to leave you, but u came back to me"; and "you told me you wanted ONLY me."

**{29}**    Defendant's challenges to these considerations are without merit. First, he contends the State did not establish, through V.P.'s testimony, that any of the above characteristics were unique. Defendant, however, cites no authority to support his contention that the State must have elicited testimony through V.P. about the distinctiveness of the Facebook message in order to rely on the same for authentication purposes. *See Casares*, 2014-NMCA-024, ¶ 18. Second, Defendant claims the State failed to show that the information in the message was known only to Defendant, citing his denial that he did not author the message and his assertion that "anyone can make a Facebook page." But Defendant points to no evidence in the record to suggest anyone other than Defendant had knowledge of information reflected in the message, motivation to write the message, or motivation to create a false account. *See Jackson*, 2018-NMCA-066, ¶ 20 (concluding that text messages purportedly written by the defendant were admissible when he pointed to no evidence in the record "that suggests anyone other than [the d]efendant . . . had access to [the phones generating the texts at issue]"). Moreover, as we have repeatedly said, such arguments go to weight, not admissibility. *See Candelaria*, 2019-NMCA-032, ¶ 55 (noting that the defendant's argument that he did not write a letter containing inculpatory statements "went to the weight of the evidence, not its admissibility"); *Jackson*, 2018-NMCA-066, ¶ 19 ("[The d]efendant's argument [that he did not write the text messages] goes to the weight of the evidence, rather than its admissibility."); *see also Romero*, 2019-NMSC-007, ¶ 41 ("The jury is left to decide the weight given to the evidence.").

**{30}**    Finally, Defendant contends that social media evidence presents special authentication problems because social media is easily falsified and argues that New Mexico, lacking guidance in its current rules and case law, should use a heightened authentication standard adopted by some other courts. As outlined above, however, the evidence in this case "was sufficient to permit a reasonable jury to believe" the Facebook message was written by Defendant, and thus the Facebook message was properly authenticated. *See Candelaria*, 2019-NMCA-032, ¶ 55; *see also State v. Hernandez*, 2009-NMCA-096, ¶ 9, 147 N.M. 1, 216 P.3d 251 ("In the event the [s]tate makes a threshold showing of authentication, then ultimately the issue of the caller's identity will be a matter for the jury to decide."). Given our record here, we find it unnecessary to address Defendant's reliance on out-of-state authority or consider departing from our New Mexico Rules of Evidence today.

---

[5] V.P. identified Juan as the friend who provided V.P. the Facebook login information that Juan obtained from Defendant, which V.P. then gave to her mother. V.P. also testified that Juan had previously facilitated communication between Defendant and V.P. by passing the diary between them.

**{31}** We conclude the district court did not abuse its discretion by admitting the Facebook message.

## IV. Prosecutorial Misconduct

**{32}** Defendant alleges prosecutorial misconduct during the State's closing. "During closing argument, both the prosecution and defense are permitted wide latitude, and the trial court has wide discretion in dealing with and controlling closing argument[.]" *State v. Smith*, 2001-NMSC-004, ¶ 38, 130 N.M. 117, 19 P.3d 254 (internal quotation marks and citations omitted); *see also State v. Sosa*, 2009-NMSC-056, ¶ 24, 147 N.M. 351, 223 P.3d 348 ("[C]losing argument, and rebuttal argument in particular, is necessarily responsive and extemporaneous, not always capable of the precision that goes into prepared remarks."). "[R]emarks by the prosecutor must be based upon the evidence or be in response to the defendant's argument." *Smith*, 2001-NMSC-004, ¶ 38. "Statements having their basis in the evidence, together with reasonable inferences to be drawn therefrom, are permissible and do not warrant reversal." *State v. Jimenez*, 2017-NMCA-039, ¶ 76, 392 P.3d 668 (alteration, internal quotation marks, and citation omitted).

**{33}** Because Defendant did not preserve these claims, we review only for fundamental error. *Sosa*, 2009-NMSC-056, ¶ 26. "Fundamental error occurs when prosecutorial misconduct in closing statements compromises a defendant's right to a fair trial[.]" *Id.* ¶ 35. "To find fundamental error, we must be convinced that the prosecutor's conduct created a reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them." *Id.* (internal quotation marks and citation omitted). "[T]he general rule is that an isolated comment made during closing argument is not sufficient to warrant reversal." *Id.* ¶ 29 (internal quotation marks and citation omitted). With these principles in mind, we conclude that the prosecutor's remarks did not amount to fundamental error.

**{34}** Defendant essentially raises two arguments with respect to the State's closing, and we address each in turn. First, Defendant argues that the State advanced a theory of the case—that Defendant penetrated V.P. with a penis—it knew to be false and made related comments not based on evidence. In relevant part to our discussion here, to convict Defendant of CSPM, the jury was charged with determining whether Defendant "caused the insertion, to any extent, of a penis or object into the vagina of [V.P.]" *See* UJI 14-962 NMRA. Defendant alleges the State knew he did not have a penis and so it was improper, and a violation of due process, for the State to advance such a theory at trial. In support, Defendant cites his testimony at the speedy trial hearing in which he testified about being booked as a female at jail. There, however, was evidence presented at trial that was contrary to this testimony. Given this, we cannot attribute actual knowledge by the State regarding Defendant's anatomy or any impropriety in the State's pursuit of such a theory at trial.

**{35}** Relatedly, Defendant asserts that the State's argument in rebuttal about the object used to penetrate V.P. was not based in evidence. In closing, defense counsel

claimed that "[Defendant] is physically unable to commit the acts that the State is telling you that he committed, because he doesn't have a penis." In rebuttal, the State responded:

> [B]y his own testimony, [Defendant] doesn't have a penis, but that's not the point. In this day and age, everyone knows what a strap-on is, and if you don't, you can ask your fellow jurors. Everyone knows that you don't have to have a penis in order to put something inside someone's vagina. It's not about whether he had a functioning penis and he can get erections. Look at the jury instructions. Look at the elements that the State has to prove. It doesn't say "[s]exual intercourse, i.e., biological male penis into biological female [vagina]." No, it[] says "penis or object." And if he says he doesn't have a penis, well, it's different than the previous times he's told people that. So either he's had a sex change and he is lying to all of us and was able to put something inside of her, or he had an object that can pass for a penis.

The State's argument that Defendant used some object, if not a penis, to penetrate V.P.'s vagina was in direct response to Defendant's closing remarks and was based on reasonable inferences drawn from the evidence. V.P. testified that she believed Defendant penetrated her vagina with his penis but that she did not see his penis as it was dark and Defendant had turned around prior to intercourse to put on a condom. We conclude the State's argument was permissible. *See Sosa*, 2009-NMSC-056, ¶ 23 (concluding that there was no error in closing arguments because, in context, the prosecutor responded to defense counsel to clarify the evidence that the jury could consider); *Jimenez*, 2017-NMCA-039, ¶ 76.

**{36}** Defendant's second argument pertains to a comment the prosecutor made during her plea to the jury to convict Defendant—specifically, the prosecutor argued, "it's up to you . . . to convict [Defendant] for what he did. For making [V.P.] take the stand and have to cry and talk about this." Defendant argues that the comment, "For making [V.P.] take the stand," invaded his Sixth Amendment right to confrontation and invited the jury to convict him for exercising his right. Defendant, however, cites no authority in his brief in chief for this argument and otherwise has failed to adequately develop it. *See Guerra*, 2012-NMSC-014, ¶ 21; *Casares*, 2014-NMCA-024, ¶ 18. We nevertheless do not condone the prosecutor's comment here and believe it improper. Despite this, upon review of the record, we cannot conclude the prosecutor's isolated comment in rebuttal was "so egregious and had such a persuasive and prejudicial effect on the jury's verdict that [D]efendant was deprived of a fair trial, thus giving rise to fundamental error." *State v. Lozoya*, 2017-NMCA-052, ¶ 38, 399 P.3d 410 (alteration, internal quotation marks, and citation omitted); *see also Sosa*, 2009-NMSC-056, ¶ 29 (providing that "the general rule is that an isolated comment made during closing argument is not sufficient to warrant reversal" (alteration, internal quotation marks, and citation omitted)).

**{37}** The prosecutor's conduct during closing arguments does not amount to fundamental error.

**CONCLUSION**

**{38}** For the foregoing reasons, we affirm.

**{39}  IT IS SO ORDERED.**

**JENNIFER L. ATTREP, Judge**

**WE CONCUR:**

**KRISTINA BOGARDUS, Judge**

**MEGAN P. DUFFY, Judge**